FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★  SEP 3 0 2015  ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JAMES A. BROOKS

              Plaintiff,

      -against-

CAROLYN W. COLVIN
Acting Commissioner, Social Security
Administration,

             Defendant.
------------------------------------------------------------X
FEUERSTEIN, J.

**ORDER**
13-CV-1073 (SJF)

       James A. Brooks ("plaintiff" or "claimant") commenced this 42 U.S.C. § 405(g) action

seeking judicial review of the final determination of defendant Commissioner of Social Security

Administration ("Commissioner") denying plaintiff's application for disability benefits. The

Commissioner now moves for judgment on the pleadings under Rule 12(c) of the Federal Rules

of Civil Procedure. For the reasons that follow, the court grants the Commissioner's motion.

I.      BACKGROUND

A.    Procedural History

       Plaintiff applied for disability benefits on May 9, 2008, alleging that he has been disabled

since January 13, 2007 (onset date). [Docket Entry No. 1]. Plaintiff claimed problems with his

lungs, back, left hip, left knee, left ankle, post-traumatic stress disorder (PTSD), and depression.

[Docket Entry No. 14 (Administrative Record (Tr.) at 312)]. The Social Security

Administration (SSA) denied plaintiff's application on August 19, 2008. Tr. at 143-44. On

September 23, 2009, the Administrative Law Judge (ALJ) dismissed plaintiff's application for

his failure to appear at his hearing. *Id.* at 145–49, 139–42. The Appeals Council reinstated

plaintiff's application, and remanded the matter for further proceedings. *Id.* at 150–53.

Plaintiff appeared with counsel and testified at a second hearing on August 5, 2010. The ALJ also called a psychological expert and a vocational expert as witnesses. *Id.* at 101–38. The ALJ afforded plaintiff's counsel an additional opportunity to cross-examine the psychological expert at a supplemental hearing on May 5, 2011. *Id.* at 81–100. On July 27, 2011, the ALJ denied plaintiff benefits. *Id.* at 65–80. The Appeals Council affirmed the ALJ's denial of benefits. *Id.* at 1–5. This appeal followed.

B.    Testimonial Evidence

Plaintiff, born June 17, 1959, was forty-eight (48) years old on the onset date, and fifty (50) years old at the time of the ALJ's decision. Tr. 308. He has a grade twelve (12) education, training as an administrative technician in the United States Marine Corps, and worked in military administrative offices. *Id.* at 105–07. He served seven-and-a half years in the Marines, and attained the rank of Sergeant E5. *Id.* at 114. In 2004, plaintiff worked as an air-sampling technician for asbestos removal. *Id.* at 106. In January 2007, he worked as a dishwasher at a Pizza Hut. *Id.* He also worked as an assistant manager at a Family Dollar. *Id.*

Plaintiff described multiple injuries to his left leg. *Id.* at 113. He explained that each injury was separate. *Id.* For example, he was struck by a van, which caused a knee injury. *Id.* He also described an ankle injury caused by "fires." *Id.* He testified that, as a result of pain in his left leg, he was incapable of walking more than a block-and-a-half, and could not run more than a few feet. *Id.* at 107. He cannot stand for any more than thirty (30) to forty-five (45) minutes. *Id.* at 109. He relies on a cane to walk. *Id.* at 110–11. He estimated that he would need to use both hands to lift a twenty (20) pound dumbbell. *Id.* at 109.

Plaintiff also testified regarding his left hip and his back, the latter being the main source of his pain. *Id.* at 111, 113. Plaintiff stated that the pain in his left leg "stemm[ed] from [his] back and . . . radiat[ed] down [his] leg." *Id.* at 113. He testified that he was currently receiving treatment from his primary care physician at the Veteran's Affairs Administration (VA), and from a private physician in Hempstead. *Id.* at 111. He received injections in his hip as part of the treatment and epidural steroid injections from the VA every three months in his back. *Id.* Otherwise, he used a TENS unit to treat his back. *Id.* at 112.

Although, "he tore something" in his left wrist, it had healed by the time of the hearing. *Id.* at 114. He had previously received treatment for this injury. *Id.*

He has hearing loss in his left ear, for which he was scheduled to undergo medical tests. *Id.* Plaintiff also testified that he suffered from memory loss, concentration problems, and sleep loss. *Id.* at 109–10. He took medication for his sleeping problems, which allowed him to sleep five (5) or six (6) hours a night. *Id.* at 110.

Plaintiff had seen a psychiatrist while in the Marines, and was hospitalized for one week in 1996 for unspecified psychiatric problems. *Id.* at 115, 116. He visited the emergency room for psychiatric problems in November 2001. *Id.* As of the hearing date, he was seeing a psychiatrist at the VA and at F.E.G.S. on a regular basis. *Id.* at 114. He described a history of depression. *Id.* at 117–18.

Plaintiff stated that he had "a big problem" with drugs and alcohol abuse in the past. *Id.* at 117. He had used drugs and alcohol as recently as 2008, but, as of the hearing, he had "been clean for the most part." *Id.*

For recreation, plaintiff reads books, watches the news, and listens to music. *Id.* at 116. He also sometimes cooks and shops. *Id.* at 116–17. Plaintiff does not drive, but has no difficulties using public transportation. *Id.* at 117.

Following plaintiff's testimony, the ALJ qualified Dr. Sharon Grand, Ph.D. as a neutral mental health expert and examined her, after which counsel cross-examined her. *Id.* at 118–27. She opined that plaintiff suffered from major depressive disorder, not otherwise specified, as well as some PTSD symptoms. *Id.* at 119. She also related a history of alcohol, cocaine, and marijuana abuse. *Id.* at 119. She testified that, the last record of his substance use was from March 7, 2009. *Id.* at 119. Dr. Grand explained that plaintiff suffered from a mood disorder precipitated by his substance abuse, as well as poly substance abuse, which constituted severe impairments. *Id.* She further explained that none of plaintiff's conditions met or exceeded a listing. *Id.* at 120.

She testified that plaintiff's depressive disorder limited his ability to work, to complete an eight-hour workday, to concentrate, and to perform different types of work. *Id.* at 120. Specifically, she explained that he would be limited to "simple, routine, low stress work." *Id.* at 120–21. Furthermore, plaintiff would be limited to this type of work even if he discontinued his substance abuse. *Id.* at 122.

Dr. Grand clarified that plaintiff's depressive disorder did not render him suicidal, homicidal, or confused. *Id.* at 123. She characterized him instead as "alert" and "oriented." *Id.* at 123. She noted that plaintiff received a 51 GAF score from Nassau University Medical Center on November 25, 2009, which indicated a "moderate level of impairment." *Id.* at 124. She also cautioned that a GAF score is "very subjective." *Id.* at 124. Dr. Grand reiterated at the May 5,

2011 supplemental hearing that if plaintiff had problems with drugs and alcohol, she would recommend that he be limited to simple, routine work. *Id.* 92.

The ALJ also examined Edna Clark, a neutral vocational expert. *Id.* at 128–37. She explained that plaintiff's prior work as an asbestos-removal worker was a heavy exertional, unskilled job. *Id.* at 129. His work as an air analyst qualified as skilled, light exertional work. *Id.* at 129. Plaintiff had no transferable skills. *Id.* at 130. Clark opined that given plaintiff's limitations, his age, education, and work history, and his ability to sit and stand, he was qualified to work as Cashier II, as defined in the Dictionary of Occupational Titles. *Id.* at 130. Furthermore, 160,000 of these jobs were available nationally, and 4,500 were available locally. *Id.* at 131.

In response to plaintiff's counsel's hypothetical questions, she testified that someone with the ability to concentrate for only one third (1/3) of the workday could not perform the duties of a Cashier II. *Id.* at 132. Moreover, she stated that someone who with problems of punctuality and attendance would not be able to maintain this type of employment, or any other type of employment. *Id.* at 132–33.

C. Medical Evidence

1. Plaintiff's Left Hip

On January 16, 2007, plaintiff presented at the Winthrop University Hospital after he "[b]anged into a table corner" three (3) days earlier while working at Pizza Hut. Tr. 354, 369, 620, 882. Plaintiff was able to continue work that day. *Id.* at 620. An x-ray exam revealed no evidence of a fracture or dislocation of the left hip. *Id.* at 357. The attending physician noted

that the 'visualized bony structures are unremarkable," and further noted pleboliths in the pelvis. *Id.* at 357.

On April 23, 2007, Dr. Steven J. Ravich, M.D. examined plaintiff's left hip. *Id.* at 620. He concluded that plaintiff enjoyed a full range-of-motion in his left hip with no limitations. Furthermore, he noted: "good strength and control of his left lower extremity"; reflexes and pulses of "2+ throughout"; no atrophy; and no swelling, cyanosis, or edema. Dr. Ravich noted that x-rays showed "two small cystic regions in the intertrochanteric region," and "some changes . . . to the neck of the femur," but no signs of arthritis. *Id.*

Dr. Ravich also ordered a magnetic resonance imaging (MRI) of plaintiff's left, hip, which revealed a .6 centimeter (cm) benign cyst on plaintiff's left femur. *Id.* at 623. The MRI revealed no lateral tearing, no marrow edema, or significant effusion. *Id.* However, it did reveal a "small amount of ascites in the pelvis" and recommended clinical correlation. *Id.*

Dr. Leonid Basovich, D.O. Woodfield Medical Services, P.C. (Woodfield) examined plaintiff for the Workers Compensation Board. *Id.* at 362–64. He found that plaintiff walked normally, with no antalgic gait, and no limp. *Id.* at 362.

Dr. Arnold M. Illman, M.D. also examined plaintiff's left hip as part of his workers compensation claim on July 16, 2007. *Id.* at 369. He found significant the fact that plaintiff injured his left leg in a 2005 incident. *Id.* at 369. Dr. Illman noted that plaintiff had a normal gait, that he was able to do a full squat, and that he "had equal abduction, flexion, internal and external rotation of both hips." *Id.* at 370. He diagnosed a hip contusion, which had healed, and "preexisting cystic changes of neck of femur." *Id.* He concluded that plaintiff had no disability and required no treatment. *Id.*

Plaintiff returned to Dr. Basovich on November 9, 2007, at which time, Dr. Basovich found tenderness in the thoracic spine at levels T1 through T12, and found tenderness and spasm of the right and left paraspinal structures. *Id.* at 634–35. He further noted a "mild sensory deficit to light touch and pin prick at and root distribution at T12, L5, S2." *Id.* at 636. He recommended that plaintiff avoid heavy work. *Id.*

Dr. Morton Aizic, D.O. at Woodfield examined plaintiff on September 22, 2008. *Id.* at 629. He concluded that plaintiff "has permanent total disability as determined by 33.3% loss on anterior flexion, 10% loss on posterior extension, 25% loss on abduction and adduction, and 15% loss on internal and external rotation. [Plaintiff's] SLU rating for the left hip is 83% loss of use." *Id.* at 629. He noted that plaintiff walked with an antalgic gait and limp. He recommended that plaintiff walk with a cane. *Id.* His prognosis was that plaintiff was "totally disabled." *Id.* at 630.

Plaintiff sought a second opinion from Dr. Andranik Khatchatrian, M.D., Ph.D. on February 2, 2009. *Id.* at 651–52. He characterized the results of plaintiff's MRI as "unremarkable," and noted that plaintiff had been undergoing a course of physical therapy for about one (1) year. *Id.* at 651. His opinion also noted that plaintiff was not working because of another work-related injury to his lower back and left knee, that he had a ten (10)-year-old injury to his left ankle, and that he walked with a cane. *Id.* He found tenderness in plaintiff's hip; limited range-of-motion; weakness of flexion in his hip and knee extension; weakness in left hip abduction; atrophy of the left quadriceps muscles; pain; and that his Patrick's Test was positive. *Id.* He recommended that plaintiff continue his home exercise program and continue to take over-the-counter Naprosyn for pain. *Id.* He concluded that plaintiff had a fifteen percent (15%) loss of use of his left leg. *Id.* at 652.

### 2. Plaintiff's Back Injuries

The administrative record shows that on February 1, 2007, plaintiff saw Dr. DaeSong Kim at the Northport VA Medical Center, Physical Medicine and Rehabilitation Department. Tr. 452–53. Dr. Kim described a history of chronic lower back and neck pain and found: tenderness in plaintiff's right-sided cervical paraspinals and limited range-of-motion in plaintiff's back. *Id.* at 452–53. Plaintiff described back pain of eight (8) out of ten (10) on a ten (10)-point scale. *Id.* at 452. Dr. Kim's notes also reference a 2005 MRI, which found "transitional vertebra with lumbarization of a sacral vertebra, correlate with an [sic] reverse" as well as "[s]hallow central disk herniations at L3-4 L4-5 resulting in minimal indentation upon the thecal sac." *Id.* at 453. Reports from the VA Medical Center in February 8, 2007, June 13, 2007, and June 27, 2007 described the same findings, except that plaintiff reported that his pain was seven (7) out of ten (10) on the pain scale. *Id.* at 451–52, 446–47, 443–45.

From November 2007 through March 2011, plaintiff also received treatment from Dr. Athena Zias at the VA Medical Center, to whom he reported positive treatment results for his back pain from ibuprofen, a lidocaine patch, and his home TENS unit. *Id.* at 398–400, 432–34, 448–50, 579–82, 594–98, 612–14, 672–73, 726–32, 866–87. He also benefitted from the use of a back brace, and group therapy sessions. *Id.* at 401, 414, 865, 723–24, 952–54, 746–47.

Dr. Aizic examined plaintiff on May 2, 2008. *Id.* at 631–33. He also found tenderness in plaintiff's thoracic spine, but no motor deficit. *Id.* at 632. He also found that plaintiff's deep tendon reflexes in his upper and lower extremities were normal. He reiterated Dr. Basovich's recommendation that plaintiff not perform heavy work. *Id.*

8

On October 23, 2008, Dr. Uzma Nasir M.D. examined plaintiff's back. *Id.* at 680. Dr.

Nasir's impression of plaintiff's condition was "pain of multifactorial etiology, myofascial pain

syndrome, neuropathic component and right sacroilitis." *Id.* His physical examination of

plaintiff revealed tenderness plaintiff's interspinous muscles and stiffness in his para lumbar

spinal muscles. He recommended that plaintiff received epidural steroid injections and sacroiliac

joint injections. *Id.*

Lumbosacral x-rays on March 26, 2009, showed slightly limited flexion, which the

radiologist attributed to muscle spasm, and "hypertrophy of the left transverse process of L5 and

pseudoarticulation with the subjacent left sacral wing." *Id.* at 690. Vertebral body heights and

disc-spaces appeared normal, as did pre- and paravertebral soft tissues. *Id.*

Plaintiff sought a medical opinion from Dr. Izhar Haque on March 27, 2009, for an

orthopedic consultation regarding his back, knee, and hip complaints. *Id.* at 593. Plaintiff

described a pain level of seven (7) out of ten (10) on a one (1) to ten (10) scale. Dr. Haque

observed tenderness in plaintiff's back and a reduced range-of-motion in his spine. Otherwise,

he noted that plaintiff's back and hip were unremarkable, and that his knees, but for some

cracking in the left knee, appeared normal. *Id.* He diagnosed myofascial pain of the lumbar

spine, and mild inflammation of the left knee. *Id.* at 594. He recommended an MRI to rule out

deterioration of plaintiff's shallow disc herniation. *Id.*

An MRI on May 22, 2009, revealed disc bulges at L3-L4 and L4 L-5, resulting in mild

spinal stenosis, and mild foraminal narrowing. *Id.* at 687–89. On August 20, 2009, Dr. Haque

reviewed the results of the MRI, compared them with the 2005 MRI, and found no need for

further follow-up visits or surgery. *Id.* at 579. He filled out plaintiff's disability forms. *Id.*

9

Plaintiff returned to the VA Medical Center on February 23, 2010, "for the sole purpose of having paperwork completed for disability renewal." *Id.* at 758. The report from that visit notes that plaintiff "was observed upon entry into the clinic, during the clinic visit while searching through his files, and upon exiting the clinic. [He] was able to move with ease for the period of time observed." *Id.* at 758. It further reflects that he had discontinued his exercises "because he is in the process of applying for SSI disability and was advised by legal counsel not to do anything that might affect his case." *Id.* at 759.

Plaintiff visited Dr. Peter Altner, at the VA Medical Center on March 11, 2010. *Id.* at 753. Dr. Altner's notes from that visit indicate that,

> Most importantly, since about two years [sic] veteran claimed service-connected injuries overseas and other related locales. He is in the process to document those occurrences. Recently some of those were found. The veteran came to us to claim continued disability.
>
> Since the physical examination did not support the claims, [we] found this veteran able [to] at least participate in sedentary activities on a trial basis. Depending on the outcome of the documentation of patient's history, we we'll [sic] re visit with the veteran as needed.

*Id.*

Dr. Kim also examined plaintiff at the VA Medical Center on March 11, 2010. *Id.* at 754. He noted disc desiccation in L3-L4 and L4-L5, "mild bilateral facet hypertrophy resulting in mild central spinal stenosis and bilateral neuroforaminal narrowing." *Id.* at 755. In addition, he noted "annular tears involving the posterior margins of the L4-L5 intervertebral disc." *Id.* He diagnosed degenerative disc disease and lower back pain, and recommended a home plan and a TENS unit. *Id.*

10

He reported to the VA Medical Center emergency room on May 19, 2010, complaining of lower back pain. *Id.* at 733. His back was tender, his range-of-motion was decreased on flexion, and straight leg raising was positive to sixty (60) degree bilaterally. *Id.* at 733–34. His gait was steady with a cane, though mildly antalgic. *Id.* at 734.

The record also reflects that Dr. Mark Panish at the Queens Long Island Medical Group, P.C. examined plaintiff's left knee and back on June 9, 2010. *Id.* at 795. His assessment was knee joint pain, lumbago, and depression. *Id.*

Dr. Peter Tse at Hempstead Medical Offices examined plaintiff on July 9, 2010. *Id.* at 797. He observed that plaintiff's stance and gait were normal, diagnosed plaintiff with lumbago, and advised him to avoid heavy lifting. *Id.* Four days later, on July 13, 2010, he saw Dr. Annibale Pluchinotta, M.D. at Hempstead Medical. *Id.* at 799. Dr. Pluchinotta observed that he was in no acute distress, that he was able to walk with a cane, but that he had a decreased range-of-motion and tenderness in the lumbosacral spine. *Id.* at 799–800. He diagnosed him with lower back pain. *Id.* at 800. Dr. Pluchinotta ordered an MRI, which revealed degenerative disc disease, and saw him again on July 30, 2010. *Id.* at 813–17, 864.

Plaintiff returned to Dr. Pluchinotta on September 10, 2010 ,who diagnosed lumbar radiculopathy and chronic lower back pain, and stated on those forms that plaintiff was unable to work due to chronic lower back pain that radiated down his left leg. *Id.* 860, 862. He referred plaintiff to Dr. Mitchell E. Levine, M.D., a spinal neurosurgeon, who recommended a laminectomy with pedicle screw fusion. *Id.* at 811. Dr. Panish cleared plaintiff for this procedure on February 1, 2011. *Id.* at 857–58.

Dr. Michael Nicolosi, a pain and rehabilitation specialist examined plaintiff on February 10, 2011. *Id.* at 875–76. He observed a limited range-of-motion, and tenderness. *Id.* at 875–76. He diagnosed lumbar spine radiculopathy and lumbar spine stenosis. *Id.* at 875. Likewise, Dr. Abiola Familusi, a pain management specialist at Hempstead Medical diagnosed lumbar canal stenosis after plaintiff's March 8, 2011 visit. *Id.* at 855. Dr. Familusi performed a straight-leg test, which was negative. *Id.*

Plaintiff underwent the lumbar laminectomy procedure on April 29, 2011. *Id.* at 904. He was discharged in stable condition. *Id.* at 871–73. Dr. Levine wrote on May 9, 2011, that plaintiff was 'doing very nice and his back pain is much better" and that he was "quite happy." *Id.* at 899. Plaintiff reiterated to Dr. Levine on June 20, 2011, that he "was feeling much better" and was "very happy with the results of his surgery." *Id.* at 1068. The incision had healed, and plaintiff could walk with a normal gait, but used a cane for stability. *Id.*

### 3. Plaintiff's Ear and Lung Complaints

In a November 27, 2007 visit to the VA Medical Center, plaintiff indicated that he might have asbestosis or another lung disease because he experienced shortness-of-breath. Tr. 553. Tests performed November 28, 2007, however, showed that plaintiff's lungs "were clear with no evidence of focal, consolidation, pleural effusions, congestive changes, or pneumothoraces." *Id.* at 626. September 30, 2010 chest x-rays confirmed the November 28, 2007 findings. *Id.* at 821.

On May 19, 2010, plaintiff underwent audiological testing because he complained that he was unable to hear others when they spoke. *Id.* at 736. He posited that his hearing problems were the result of having worked near aircraft during his period of military service and near pumps while working as an asbestos-tester, and from having been shot in the face in 1996. *Id.* at

736. However, his right ear and left ear speech recognition tests came in at ninety-six percent (96%) and one hundred percent (100%), respectively. *Id.* at 737. Moreover, "[o]toscopy revealed clear EAC's bilaterally" and tests revealed "negative reflex decay" in both ears. *Id.* "Impedance testing resulted in a hypermobile Type Ad tympanogram in the right ear and a normal Type A tympanogram in the left ear." *Id.*

### 4. Plaintiff's Mental Health and Substance Abuse

Plaintiff sought mental health treatment at the VA Medical Center on November 15, 2007. Tr. 436–40. The record reflects that he was involved in social activities and that the lived in a supervised residence. *Id.* at 437. He admitted to alcohol use. *Id.* A PTSD screen revealed no indicators of PTSD. *Id.* at 440. A June 6, 2007 urine screening indicated the presence of marijuana and cocaine. *Id.* at 439.

A November 27, 2007, PTSD screen, however, was positive. *Id.* at 435. Accordingly, Plaintiff saw psychiatrist Dr. Vandana Peddu the same day. *Id.* at 429–32. Dr. Peddu noted normal grooming, hygiene, attention, and recent memory, although plaintiff appeared anxious and had a "tearful affect at times." *Id.* at 429.

Plaintiff reported sleep difficulties, "down mood," physical pain, frustration with "the system" and family members, and feeling unable to solve his problems. *Id.* at 430. He expressed vague thoughts of suicide, "but no active plans." *Id.* He admitted to using drugs and alcohol. *Id.* Dr. Peddu's diagnostic impression was substance induced mood disorder and poly substance abuse. *Id.* at 431. She assigned a global assessment of functioning (GAF) score of 50. *Id.*

Plaintiff saw Dr. Peddu again on January 8, 2008 and April 1, 2008. *Id.* at 415–21, 405–12. She prescribed Quetiapine and Zoloft for depression. *Id.* at 417, 407. By June 13, 2008, he reported being in "high spirits," and hopeful about the future because he would be working as a security guard. *Id.* at. 512–13. Dr. Peddu's diagnostic impression was "[a]djustment reaction with anxious mood" and "[p]olysubstance abuse in remission." *Id.* at 513. Dr. Peddu's record of plaintiff's October 15, 2008 visit also noted that he was optimistic about his upcoming job as a security guard, and the fact that he had obtained permanent veteran's housing. *Id.* at 682. However, by February 19, 2009, he expressed that he was unable to work due to his constant pain. *Id.* at 606.

Plaintiff also sought psychiatric treatment from F.E.G.S. on May 4, 2010, due to recurring dreams of being shot, and insomnia. *Id.* at 877. The report from that visit listed a 1996 psychiatric hospitalization in which plaintiff admitted himself to hospital because he believed that someone was chasing him. *Id.* He presented as alert and attentive, interacted appropriately with staff, and demonstrated good concentration. *Id.* at 878–79. The report also noted that plaintiff had received a grade twelve (12) education, and computer training from the military. *Id.* at 882. The report prepared by F.E.G.S. indicates a diagnosis of depressive disorder, not otherwise specified (NOS), and a history of alcohol dependence. *Id.* at 887. His GAF score was 45. *Id.*

A September 30, 2010 record from the VA Medical Center indicates that plaintiff was referred by a physician because he expressed suicidal ideation, "increasing depression, alcohol use, and violent ideation (toward man who injured him) and suicidal ideation with plan (medication overdose)," and "increasing social isolation." *Id.* at 843–44. Attending psychiatrist

14

Dr. Murty Ayyala diagnosed a mood disorder, and rule out dysthymic disorder and recurrent major depressive disorder without psychosis, and polysubstance dependence. *Id.* at 840. She gave plaintiff a GAF score of 50–55. Dr. Jeffrey Gold admitted plaintiff to the VA's rehabilitation program for polysubstance dependence and depression. *Id.* at 830.

D. Consultative Examinations

The New York State Office of Temporary Disability Assistance, Division of Disability Determinations referred plaintiff to Dr. Evelyn Wolf, M.D. on August 5, 2008. Tr. 461. She reported that plaintiff's chief complaints were his lower back injury, a torn tendon in his left ankle, a torn meniscus in his left knee, a perforated ear drum, a 1996 gunshot wound that affected breathing in his left nostril, an injury to his left wrist in a recent fall, inability to walk a block due to pain, depression, and substance abuse. *Id.* at 461–62. Dr. Wolf observed, however, that plaintiff "appeared to be in no acute distress," that his gait was normal, and that he was able to walk on his heels and toes without using a cane. *Id.* at 462. He was able to get onto the examination table without assistance, and able to rise from his chair without difficulty. *Id.* His chest and lung examination revealed no abnormalities. *Id.* at 463.

His cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. *Id.* at 463. His lumbar spine flexion and extension were zero (0) to ninety (90) degrees; hip flexion and extension were zero (0) to one hundred (100) degrees bilaterally; knee flexion and extension were zero (0) to one hundred fifty (150 degrees bilaterally; ankle dorsi and plantar flexion were full bilaterally; he had "no evident subluxations, contractures, ankyloses, or thickening"; and "[n]o redness, heat, swelling, or effusion." *Id.* Dr. Wolf concluded that plaintiff "is minimally limited in walking, standing, and climbing. No

15

limitation in sitting, provided he can stretch from time to time. He is mildly limited for lifting. No limitation on use of his hands for fine and gross activities, including repetitive activity." *Id.* at 464. Dr. Wolf ordered x-rays of plaintiff's left knee and left ankle which revealed that the "joint spaces [were] relatively well maintained," and showed no signs of damage. *Id.* at 466, 467.

Psychiatrist Dr. Kathleen Acer, Ph.D. also evaluated plaintiff on August 6, 2008. *Id.* at 468. She noted a twenty (20)-year history of depression, and a history of chronic pain. *Id.* Plaintiff reported to her that he had difficulty sleeping, weight loss, depression, crying spells, and paranoia. *Id.* at 468–69. His affect was dysphoric, and his mood dysthymic and tearful. *Id.* at 469. She described him as alert and oriented, but "confused and irrelevant at times with paranoid thought patterns and some rather delusional thought patterns about the military." *Id.* She described his memory attention and concentration as "impaired," noting that he had difficulty with simple calculations. *Id.* at 470. She concluded that

> With regard to vocational capacity, he can follow and understand simple instructions and directions. He may be able to perform some simple rote tasks. He may have trouble maintaining attention and concentration, maintaining a regular schedule, learning new tasks, performing complex tasks independently, making appropriate decisions, adequately relating with others, and dealing with stress.

*Id.* She diagnosed "[m]ajor depressive disorder, severe with psychotic features" and "[a]lcohol abuse in full sustained remission." *Id.* at 471. Her prognosis for plaintiff was "[f]air given the longstanding nature of his depression." *Id.*

E.     Disability Investigator

A report dated August 8, 2008 by the Cooperative Disability Investigations Unit reflects that on August 5, 2008, an investigator observed plaintiff walking several blocks on foot with a

companion. Tr. 474–79. The investigator noted that plaintiff did not rely on the cane, often carrying it under his arm, or tapping the ground with it as he walked normally. *Id.* at 475, 478. Plaintiff did not seem depressed or anxious, but instead interacted "well enough to the several people with whom he exchanged words," "suddenly bolt[ed] and [ran] down a small hill" to catch a bus, and climbed several steps. *Id.* at 475–76. Plaintiff appeared to the investigator as friendly in his interactions with others, and able to "concentrat[e] on and attend[] to matters at hand." *Id.* at 477. He did not show any signs of physical pain or discomfort. *Id.* He was able to walk at a quick pace for a sustained period of time. *Id.*

 F. ALJ Decision

 Applying the five (5)-step sequential analysis set forth in 20 C.F.R. § 404.1520, the ALJ decision dated July 27, 2011, found that plaintiff was "not disabled" within the meaning of the Social Security Act. Tr. 74. Specifically, the ALJ found that plaintiff met the insured status requirements of the Social Security Act and had not engaged in substantial gainful activity since the onset date. *Id.* at 67–68. He further found that plaintiff had severe impairments: lumbar spine disorder, depressive disorder, PTSD, substance induced mood disorder, and polysubstance use disorder. *Id.* at 68.

 The ALJ found, however, that the record did not support a finding that plaintiff's left hip pain, left ankle pain, left leg pain, left wrist pain, and left ear pain and hearing loss imposed anything more than minimal limitations on his ability to work. *Id.* at 68. He pointed to Dr. Wolf's x-rays of plaintiff's left knee and left ankle, the MRIs and x-rays of plaintiff's left hip, audiological tests of plaintiff's hearing, and the opinion of Dr. Illman that plaintiff's left hip had healed. *Id.*

Next, the ALJ found at step three (3) that none of plaintiff's impairments met the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. *Id.* The ALJ found, after considering Listing 1.04, the listing pertaining to lumbar spinal disorders, that plaintiff did not suffer from neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss, atrophy, and sensory or reflex loss, and that plaintiff's mental impairments did not meet or equal those set forth in Listings 12.04, 12.06, and 12.09 and did not satisfy the "paragraph B criteria," or the "paragraph C" criteria. *Id.* at 69.

He also found that, despite polysubstance abuse, plaintiff had the residual functional capacity (RFC) "to perform a wide range of light work"; that he can lift or carry twenty (20) pounds and sit, stand, or walk up to six (6) hours in an eight (8)-hour day, 20 C.F.R. § 404.1567(b); that plaintiff's "occupational base is not significantly eroded by additional nonexertional limitation that restrict him to jobs that provide a sit-stand option and require no more than simple, routine, low stress work." *Id.* at 70. The ALJ pointed out that plaintiff admitted to being able to: lift a twenty (20)-pound dumbbell; sit continuously for one (1) hour and stand continuously for forty-five (45) minutes; run for short distances, such as when running for a bus; and to get five (5) to six (6) hours of sleep a night. *Id.* Moreover, the ALJ pointed out that there were no hospitalizations since 1996, and no emergency room visits since November 2001 for psychiatric problems; that plaintiff read books, listened to music, and cooked and shopped; and was able to take care of himself, such as by taking public transit. *Id.*

Additionally, the ALJ found that although the record confirmed plaintiff's diagnosis with lumbar spine disorder, it did not support his claim of disability. *Id.* He pointed to Dr. Wolf's report that plaintiff was able to walk without a cane, get on and off the exam table, squat, and

18

appeared to be in no distress. *Id.* at 71. Furthermore, the ALJ credited Dr. Levine's reports that plaintiff's surgery was successful, and that plaintiff was satisfied with its results. *Id.*

The ALJ also considered Dr. Basovich's warning that plaintiff be restricted from heavy work, but adopted Dr. Wolf's opinion that plaintiff had no restrictions against sitting, provided he be allowed to stretch occasionally, and was minimally limited in walking, standing, climbing, and in his motor abilities. *Id.*

The decision also discussed plaintiff's work limitations as they related to his PTSD, substance induced mood disorder, and polysubstance abuse disorder. He pointed to medical records from the VA Medical Center and F.E.G.S. which indicated that plaintiff demonstrated proper mood and affect, "coherent and goal drive thought process," a cooperative attitude, appropriate thought content, normal appearance, concentration, memory, impulse-control, and judgment. *Id.* The ALJ explained that Dr. Grand's testimony explaining the psychiatric records supported the view that plaintiff's mental functions were within a normal range, and would not impact his ability to work. *Id.* at 72. He also noted that plaintiff's testimony contradicted his subjective complaints of disability, noting that plaintiff was able to live independently and to maintain sufficient concentration to read books and watch television. *Id.*

The ALJ assigned a greater weight to the opinions of Dr. Levine and Dr. Basovich because of their longstanding relationships with plaintiff, and because their opinions enjoyed record support. *Id.* Similarly, he gave great weight to the opinions of Dr. Wolf and Dr. Grand because their opinions were consistent with record evidence, and also gave some weight to the opinions of the Dr. Acer, and the state agency's psychological consultant. *Id.*

19

At step four (4), the ALJ found that plaintiff could not perform any past relevant work, and proceeded to step five (5). *Id.* He found that plaintiff, age fifty, was closely approaching retirement age, 20 C.F.R. § 404.1563; that he had a high school education and could communicate in English, 20 C.F.R. § 404.1564; and that the transferability of his job skills was not material to the determination of disability. *Id.* at 73. The ALJ explained that Medical-Vocational Rules 202.14 and 202.21 provide that a claimant who has the RFC to perform a full range of light work is not disabled. *Id.* "However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations." *Id.* In that regard, he credited the testimony of the vocational expert regarding the availability of light, unskilled work in the national and local economies, such as Cashier II. *Id.* Accordingly, he found that given plaintiff's RFC, age, education, and work experience, he could perform significant numbers of jobs. *Id.*

## II. DISCUSSION

In support of its motion for judgment on the pleadings, the Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence. Defendant's Brief (Def.'s Br.) 22–26. Additionally, the Commissioner urges the Court to find that the ALJ properly found plaintiff not disabled at step five (5) of the sequential evaluation set forth in 20 C.F.R. § 404.1520. Def.'s Br. 26–27. Plaintiff's submission in opposition to the Commissioner's Rule 12(c) motion consists of a letter in which he asserts that he is disabled. Plaintiff's Letter Brief (Pl.'s Br.). He also submits additional medical records.

A. Standards of Review

    1. Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard applied to a Rule 12(c) motion is the same as that applied to a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). To survive such a motion, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009) (internal quotation marks omitted). The court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Id.* at 679. The court is limited "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

    2. Review of Determinations by the Commissioner of Social Security

Upon review of the final decision of the Commissioner, a court may enter "judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A district court must consider whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and citation omitted). "In determining whether the [Commissioner's] findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks and citation omitted).

Although the Commissioner's findings of fact are binding as long as they are supported by substantial evidence, this deferential standard of review is inapplicable to the Commissioner's conclusions of law or application of legal standards. *See Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). Rather, courts have a statutory and constitutional duty to ensure that the Commissioner has applied the correct legal standards, regardless of whether the Commissioner's decision is supported by substantial evidence. *See Pollard v. Halter*, 377 F.3d 183, 188–89 (2d Cir. 2004). If a court finds that the Commissioner has failed to apply the correct legal standards, the court must determine if the "error of law *might* have affected the disposition of the case." *Id.* at 189 (emphasis added). If so, the Commissioner's decision must be reversed. *Id.*; *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If the application of the correct legal standard could lead only to the same conclusion, the error is considered harmless and remand is unnecessary. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

B.      Evaluation of Disability

1.      Standard for Determining Disability

42 U.S.C. § 423(d)(1)(A) defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability benefits are only available where an individual has a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). For the purposes of this section:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

The regulations promulgated under the Social Security Act require the Commissioner to apply a five (5)-step sequential analysis to determine whether an individual is disabled under Title II of the Social Security Act. 20 C.F.R. § 404.1520; *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). The first step of the sequential analysis requires the Commissioner to determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i) and (b). "Substantial work activity" "involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). "Gainful work activity" "is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972(b). If a claimant is doing "substantial gainful activity," the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i) and (b). If the claimant is not engaged in any "substantial gainful activity," the Commissioner proceeds to the second step.

The second step requires the Commissioner to consider the medical severity of the claimant's impairment to determine whether he or she has a "severe medically determinable physical or mental impairment that meets the duration requirement in C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment, or combination of impairments, is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). To meet the duration requirement, the claimant's impairment must either be "expected to result in death, [or] it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. The Commissioner will proceed to the next step only if the claimant's impairment is medically severe and meets the duration requirement.

At the third step, the Commissioner considers whether the claimant has a medically severe impairment that "meets or equals one of [the] listings in appendix 1 to subpart P of [20 C.F.R. Part 404 of the Social Security Act] and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets or equals any of the listings and meets the duration requirement, the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(d). If the claimant is not found to be disabled at the third step, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity [("RFC")] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The RFC considers whether "[the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20

C.F.R. § 404.1545(a). The RFC is "the most [the claimant] can still do despite [his or her] limitations." *Id.*

At the fourth step, the Commissioner compares the RFC assessment "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv) and (f). If the claimant can still do his or her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot do his or her past relevant work, the Commissioner proceeds to the fifth and final step of the sequential analysis.

At the fifth step, the Commissioner considers the RFC assessment "and [the claimant's] age, education and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can adjust to other work, the claimant is not disabled. *Id.* If the claimant cannot adjust to other work, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v). The claimant bears the burden of proving first four (4) steps of the sequential analysis, while the Commissioner bears the burden at the last step. *See Talavera*, 697 F.3d at 151.

C.     Application of the Five-Step Sequential Analysis

In this case, the ALJ's decision rests on substantial evidence. The ALJ found, in substance, that although plaintiff suffered severe impairments, namely lumbar spine disorder, major depression, PTSD, substance induced mood disorder, and polysubstance use disorder, and could not perform past relevant work, these limitations nevertheless allowed him to work numerous light-duty jobs, such as Cashier II. Tr. 68–74.

Initially, the Court concurs with the ALJ's findings regarding plaintiff's alleged disabilities of his left hip, lungs, ankle, leg, wrist, and hearing. The medical evidence regarding

plaintiff's left hip, including x-rays and MRIs, revealed nothing remarkable. *Id.* at 357, 623, 651. And while Dr. Aizic opined that plaintiff was "totally disabled," the ALJ was free to credit the contrary opinion of Dr. Illman in light of the objective medical evidence. *Id.* at 630, 370; *see* 20 C.F.R. § 404.1527(d) and § 404.1527(e) (providing that ALJ may afford greater weight to medical opinions better supported by the record, and may reject medical opinions as to whether a claimant is disabled). Likewise, the x-rays of plaintiff's left knee and ankle ordered by Dr. Wolf revealed well-maintained joint spaces and nothing to support plaintiff's claim of disability. *Id.* at 466, 467. Finally, the ALJ properly found no medical evidence of pulmonary or auditory disabilities as audiological testing and chest x-rays failed to reveal evidence of either alleged disability. *Id.* at 737, 553, 626, 821.

In addition, there is ample support in the record from which the ALJ properly concluded that plaintiff suffered from lumbar spine disorder, such as the numerous treatment records from the VA Medical Center which described his pain, the May 2009 MRI which found disc bulges in plaintiff's L3-L4 and L4-L5 vertebrae, and Dr. Levine's records describing plaintiff's surgery. *E.g.*, *id.* at 352–53, 687–89, 904. A review of the medical evidence in the record indicates that plaintiff's symptoms did not meet those described in Listing 1.04 (listing "neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss, (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test" as well as "spinal arachnoiditis" and "lumbar spine stenosis" if accompanied by pseudoclaudication). For example, Dr. Ravich found no evidence of atrophy, *id.* at 604, Dr. Aizic's examination found no loss of reflexes or motor abilities, *id.* at 632, and Dr. Familusi' straight-leg test was negative. *Id.* at 855. On the

other hand, the medical observations of Drs. Wolf, Tse, Kim, and Basovich demonstrated that plaintiff was able to walk normally, or with only minimal limitations. *Id.* at 462, 797, 734, 362. The Court also finds substantial evidence to support the ALJ's finding that plaintiff's lumbar spine disorder restricts him to light work, but with no restrictions on walking, sitting, or standing, in the opinions of Dr. Basovich and Dr. Wolf. *Id.* at 636, 462–64.

The testimony of Dr. Grand, and the medical records from F.E.G.S. and the VA Medical Center also support the ALJ's conclusion that plaintiff suffered from major depression, PTSD, substance induced mood disorder, and polysubstance use disorder. *Id.* at 119, 887, 840, 830. However, these severe impairments did not, even in combination, meet or exceed the criteria set forth in Listings 12.04, 12.06, and 12.09. Paragraph B of Listing 12.04 requires that for an affective disorder to constitute a disability, it should result in: (1) "Marked restriction of activities of daily living"; (2) "Marked difficulties in maintaining social functioning"; (3) "Marked difficulties in maintaining concentration, persistence, or pace"; or (4) "Repeated episodes of decompensation, each of extended duration." The Court agrees with the ALJ that the record does not suggest the presence of these factors. To the contrary, plaintiff's own testimony establishes that he is self-sufficient, that he only "sometimes" has difficulties in concentrating and getting along with others, and that he engages in activities that require concentration, such as reading. *Id.* at 116–18; *see* 20 C.F.R. § 404.1529(c)(3) (providing that a claimant's daily activities may be considered in determining disability). Moreover, the Court finds that Dr. Grand's testimony supports the ALJ's finding that plaintiff's severe mental impairments restrict him to simple, routine work. Tr. 120–21.

Finally, the ALJ's findings at steps four (4) and five (5) have substantial record support. The testimony of the vocational expert, established both: (1) that plaintiff was unable to perform past relevant work as an asbestos removal worker; and (2) that that an individual with his limitations was capable of working a significant number of jobs in the national economy, such as Cashier II. *Id.* at 129–31; *see Bapp v. Bowen*, 802 F.2d 601, 604–05 (2d Cir. 1986) (explaining that an ALJ may rely on the opinion of a vocational expert when a claimant presents nonexertional limitations in addition to exertional limitations). In sum, the Court affirms the ALJ decision dated July 27, 2011 because the findings therein enjoy substantial evidential support, and because the Court finds no legal error. *Meney v. Astrue*, 793 F. Supp. 2d 621, 623 (2011) ("The Commissioner's decision that plaintiff is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards.").

Plaintiff's submission consists of a letter and several documents. While plaintiff's submissions shed light on the origin of plaintiff's back injury, and his efforts to obtain a retroactive medical discharge from the military, they do no suggest that he is disabled beyond the level suggested by the record before the ALJ. Consequently, the Court finds that plaintiff's submission presents no basis to reopen the record. *See* 42 U.S.C. § 405(g) (providing that district court may remand to the Commissioner to consider additional evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding").

### III.  CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is granted.

**SO ORDERED.**

s/ Sandra J. Feuerstein

Sandra J. Feuerstein
United States District Judge

Dated: September 30, 2015
      Central Islip, New York